DETZEL, Appellant,

v.

BRUSH WELLMAN, INC., Appellee.

[Cite as *Detzel v. Brush Wellman, Inc.* (2001), 141 Ohio App.3d 474.]

Court of Appeals of Ohio,
Sixth District, Ottawa County.

No. OT–00–005.

Decided Feb. 9, 2001.

*Thomas A. Sobecki,* for appellant.

*Denise M. Hasbrook* and *Constance A. Snyder,* for appellee.

KNEPPER, Judge.

This is an appeal from the judgment of the Ottawa County Court of Common Pleas that granted appellee, Brush Wellman, Inc. ("Brush Wellman"), summary judgment against appellant, David Detzel, on his discrimination action made pursuant to the Americans with Disabilities Act ("ADA"). For the reasons that follow, we affirm the decision of the trial court.

Appellant raises the following on appeal as his sole assignment of error:

"The trial court committed substantial, prejudicial, and reversible error in granting appellee's motion for summary judgment by erroneously finding that appellee's articulated reasons for taking adverse employment actions against appellant were not pretext for disability/handicap discrimination."

## STATEMENT OF THE CASE

Appellant filed a complaint on May 29, 1998, and an amended complaint on September 17, 1998, against Brush Wellman, pursuant to Section 107(a) of the Americans with Disabilities Act ("ADA") (Section 12117, Title 42, U.S.Code), Section 706 of Title VII of the Civil Rights Act of 1964 (Section 2000e–5, Title 42, U.S.Code), and R.C. Chapter 4112. Specifically, appellant asserted that Section 12102(2), Title, 42 U.S. Code applied to his situation, *i.e.,* that he had "a record of such an impairment" and was "regarded as having such an impairment" by Brush Wellman. Appellant also sued Brush Wellman for intentional infliction of emotional distress.

On October 20, 1999, Brush Wellman filed a motion for summary judgment and argued the following: (1) Brush Wellman was justified in terminating appellant's employment because appellant was unable to do his job and had poor work performance; (2) appellant was not disabled within the meaning of the ADA; (3) appellant failed to raise any issue of fact suggesting that Brush Wellman regarded appellant as being disabled or that he had a record of being disabled; (5) appellant failed to show that, but for his perceived disability, he was "otherwise qualified" for his position; and (6) appellant failed to establish his claim for intentional infliction of emotional distress.

The trial court entered judgment in Brush Wellman's favor on January 27, 2000. Specifically, the trial court held that appellant failed to prove his disabled status under "a record of impairment." The trial court, however, did find that there existed a genuine issue of material fact concerning whether Brush Wellman "perceived" appellant as having a disability, *i.e.,* a mental disability. This finding was based on the fact that a Brush Wellman employee suggested that appellant seek counseling from a psychologist and that specific remarks were made to appellant concerning his inability to perform a certain class of jobs, *e.g.,* heavy industry or factory jobs. With respect to the issue of whether appellant was "otherwise qualified" to perform the "essential functions" of his job, the trial court found that Brush Wellman had failed to demonstrate what were the "essential functions" of appellant's position in the cast shop. Without knowing what appellant's "essential functions" were, the trial court held that there was a genuine issue regarding whether appellant was "otherwise qualified" for the furnace operator position in the cast shop. Accordingly, the trial court held that appellant established a prima facie case of disability discrimination.

The trial court then considered whether Brush Wellman had proffered sufficient nondiscriminatory reasons to warrant appellant's discharge and whether appellant had demonstrated that Brush Wellman's proffered reasons for discharge were a mere pretext. In its analysis, the trial court relied on *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66

Ohio St.2d 192, 198, 20 O.O.3d 200, 203, 421 N.E.2d 128, 132, which stated, "Pretext may be proved either by direct evidence that racial animus motivated the discharge or by discrediting the employer's rebuttal evidence." The trial court further cited *Plumbers*, which stated, "Whether or not the employer has good cause to terminate an employee is not an issue in an employment discrimination case. Even if the employee is discharged unnecessarily or in error, the employer is not guilty of racial discrimination, unless plaintiff proves that he was treated differently on account of his race from other employees with the same work history, committing the same type infraction." *Id.* at 199, 20 O.O.3d at 204, 421 N.E.2d at 132–133. The trial court further noted that the *Plumbers* racial-discrimination analysis was applicable to a handicap-discrimination case, citing *Hood v. Diamond Products, Inc.* (1996), 74 Ohio St.3d 298, 302, 658 N.E.2d 738, 741–742.

The trial court proceeded to find that Brush Wellman submitted a documented history of multiple incidents of poor work performance and attitude by appellant, for which he had been disciplined, that led to his discharge. The trial court recognized that appellant disagreed with his share of responsibility for some of the incidents. The trial court, however, stated, "The issue here is not whether [Brush Wellman] had a good cause or made a sound business judgment to discharge [appellant]. Rather, the issue is whether the cause provided by [Brush Wellman] was a pretext for disability discrimination."

The trial court then considered whether Brush Wellman's proffered reasons for discharge were a mere pretext. Appellant claimed that he was treated differently from other employees who were permitted to "bid out" of the cast shop. According to appellant, although these employees had made the same mistakes as appellant, they were allowed to "bid out" and appellant was not. With respect to this claim, the trial court found that there was insufficient evidence regarding the circumstances of those other individuals to conclude that their work histories and infractions were similar to appellant's. As such, the evidence was insufficient to establish that appellant had been treated differently. Additionally, the trial court stated, "More important, there is not any evidence from which a reasonable person could infer that the different 'bidding out' treatments were on account of [appellant's] 'perceived mental impairment.'" With respect to Brush Wellman's alleged failure to train appellant the same as other employees, the trial court noted that this allegedly disparate treatment had occurred a year before psychological counseling was suggested. As such, the trial court failed to see a connection between the alleged denial of training in 1995 and appellant's perceived disability which was not established until 1996, if at all.

The trial court additionally granted Brush Wellman summary judgment on appellant's claim pursuant to R.C. Chapter 4112, which parallels the ADA, and on

appellant's claim of intentional infliction of emotional distress. Insofar as appellant does not raise either of these issues on appeal, no further consideration of these issues will be given.

## STATEMENT OF FACTS

Appellant was employed by appellee beginning on or about April 9, 1984, and was terminated on February 28, 1997. Between 1984 and 1994, appellant worked in appellee's pebbles, oxide, and recycling department. In 1994, appellant was transferred to the cast shop department, where he remained until 1997 when he was fired. During his time in the cast shop, appellant had a number of infractions for which he was counseled and for which he eventually was required to write two "commitment" letters in order to maintain his employment.

According to Michael Pevets, a manager in the cast shop, appellant's infractions produced unsuitable metal, caused time delays, and jeopardized appellant's safety. For example, on July 8, 1994, appellant inappropriately placed a red hot stick of metal into an induction furnace, causing the metal to blow out of the furnace; on another occasion, appellant loaded wet metal into a furnace, thereby causing it to blow out hot metal; on April 30, 1996, appellant skimmed the furnace improperly, causing the chute to plug, filled a furnace with the incorrect metal, and then made some calculation errors when attempting to remedy the problem, thereby causing the entire batch to be remelted; on November 30, 1996, appellant did not start up a furnace when he was told to because he decided to eat his lunch first; and, on February 23, 1997, appellant pulled a lever the wrong way and caused billets to come up through the molds, which caused in excess of $1,500 in damage. Additionally, Dick Hillier, the area supervisor at the time, testified that he reviewed a number of other issues with appellant, including matters regarding improper painting (June 5, 1996); improper setup that caused a three-hour delay (June 7, 1996); having no respirator while skimming and rubbing (June 10, 1996); needing to be told when to rub a furnace (June 10, 1996); improper measuring of metal causing two heals to be below minimum weight, making them scrap (July 5, 1996).

In response to some of these infractions, appellant testified as follows. With respect to the July 8, 1994 incident, appellant testified that he removed the stick of metal from the furnace to place it in the stick holder; however, Carlton Geisler was in appellant's way while talking on the phone, so rather than risk burning Geisler, appellant placed the stick back into the furnace, causing the hot metal to blow out of the furnace, burning appellant. The incident report regarding this incident stated that appellant was instructed to rest the "stick over furnace opening until area was clear instead of placing back into furnace." With respect to the incident where appellant loaded wet metal into the furnace, appellant

testified that only wet metal was left to be loaded when he was instructed to fill the furnace and, therefore, there was no way he could have loaded the wet metal into the furnace first, as instructed.

With respect to the April 30, 1996 incident, appellant testified that he thought he was skimming properly and that the clogged chute must have been caused by the previous shift. He also testified that he had read the posted notice informing him of what metal needed to be loaded in the furnace, but that when he returned from break, his coworker did not specify that the special metal needed to be put in, so he filled the furnace with the metal sitting by the furnace. With respect to the calibration error, appellant admitted that he did not heat the metal at a high enough temperature, considering the fact that the special metal was not in the mix, and that it needed to then be completely remelted. Following this incident, appellant was asked to write his first letter committing to improve his work performance and was transferred to Greg Shammo's shift.

Appellant gave no explanation for the incidents in June and July 1996 that Hillier testified he reviewed with appellant. After concluding that appellant was not living up to his first commitment letter, appellant was required to write his second commitment letter on July 16, 1996.

Regarding the November 30, 1996 incident, appellant testified that he started work that day at 4:00 a.m., rather than 8:00 a.m. Appellant was told by Dave Ernsberger to have a furnace going by 11:00 a.m.; however, at 10:55 a.m., when appellant finished what he had been working on, appellant decided to eat his lunch before starting the furnace. When Ernsberger came into the break room to press appellant about getting the furnace running, appellant stated that he went outside the break room and saw that the hoist he would need to use was in use so he could not start the furnace, so he went back and finished his lunch, and had the furnace running by 11:20 a.m. Shammo disagreed with appellant's version of the events. In an e-mail written to Pevets, Shammo stated that the hoist was available the entire time and that the furnace did not get started until 11:35 a.m. Appellant was counseled that breaks had to revolve around the furnaces' heats, not the other way around.

With respect to the final incident prior to appellant's termination, appellant testified that he was responsible for pulling a lever the wrong direction, but he blamed his mistake on the fact that a coworker had been yelling directions at him, which was distracting to him.

In general, Pevets described the disciplinary process as follows: first infraction, employee is verbally counseled by supervisor and employee's lead man; second infraction, another counseling session with a verbal commitment being gotten from the employee to make the necessary changes; third infraction, employee writes a written commitment letter. Pevets testified that an employee

is only counseled the way appellant was when there have been repeated occurrences.

Appellant was repeatedly counseled throughout his time in the cast shop by Pevets and Hillier. Following the April 30, 1996 incident, appellant was asked to write a commitment letter regarding the steps he would take to alleviate his errors. Appellant's letter stated as follows:

"I Dave Detzel make a commitment to you Mike Pevets, Dick Hillier, Dan Gorrill, to redouble my efforts to make a quality product as quickly and safely as I can. I will follow all [standard operating procedures ('S.O.P.')] and all safety procedures. I will be as alert and focused on the job as I possibly can be. I will be more attentive to the details of my job. I will do all these things on an ongoing basis. I will learn more about other aspects of the Cast Shop more intimately. If you feel that I am not living up to my commitment please let me know as soon as possible so that I may correct it. I really want to be a part of the team!"

Following appellant's first commitment letter, Dan Gorrill in personnel suggested to appellant that he seek counseling with James Guinan, Ph.D., who was included in Brush Wellman's employee assistance services.[1] Mike Wood, area leader, testified that it was normal custom to offer as an option to an employee who was having problems at work with performance to go see a psychologist. Pevets also testified that suggesting counseling was an aid Brush Wellman used to achieve behavioral change.

It was also recommended to appellant that he seek a new crew to alleviate appellant's belief that he was being blamed for errors that were not his own. As such, appellant transferred to Greg Shammo's shift. Shammo was asked to document appellant's performance, which he did. After more incidents had occurred, on July 17, 1996, to continue his employment, appellant was again required to write a commitment letter, which stated:

"I Dave E. Detzel am focusing to make a superior product by following the S.O.P. exactly. I will be where I am supposed to be, doing what I'm supposed to be doing, when I am supposed to be doing it in accordance with the heat card instructions, the S.O.P. and the Cast Shop clock! I will follow all safety procedures and use all required safety equipment to do my job. I will work with a positive attitude. I will learn more than is required of me. I will do more work

---

1. Except for an assumption by appellant, it is uncontroverted that Guinan told Brush Wellman nothing about his sessions with appellant. In his deposition, Dr. Guinan described appellant as having a "passive aggressive personality" and found him to be argumentative and "very resistant."

than is required of me. I will be someone most people will want to work with. I will not miss scheduled work days."

Added to this second commitment letter was a post-script that appellant was required to add, which read:

"P.S. I mean what I say in this letter, I will continue with my counseling sessions, will take drug tests as required and give up my right to bid out of the Cast Shop for one year.

"All of the above are conditions for continued employment."

Hillier stated that as far as job performance went, appellant "may have been the worst" employee in the cast shop. Hillier based his opinion upon evaluations he received from lead operators. Carlton Geisler, cast shop supervisor, testified that appellant required extra help because he "may not have understood the job or how we wanted to do it, to make sure the S.O.P.'s were followed." Geisler did testify that the extra help appellant required was not any more than the help required by some other employees; however, he also testified that he was not surprised when appellant was fired. Wood testified that appellant destroyed at least two molds for raising the cast billet through the mold, damaging the hot top part of the mold, as well as the mold itself. Wood testified that other employees made similar mistakes, but that appellant's mistakes were not "just a one mistake thing."

Also of significance is appellant's argument that Brush Wellman's discrimination against him was evidenced in the fact that he was not permitted to "bid out" of the cast shop when an opening became available in another area. At the time this other position became available, appellant was under his second letter of commitment, which stated he would give up his right to bid out of the cast shop for one year. According to appellant, he had been told by Shammo, appellant's lead operator at the time, that Pevets would allow appellant to bid out of the cast shop despite his commitment so long as Pevets would still be appellant's supervisor. Pevets would be the supervisor over the opening appellant sought; however, appellant was not awarded the job. Pevets testified that appellant did not receive the job because he was under a commitment to stay. Appellant, however, testified that Pevets told him he could not transfer because he did not deserve it insofar as appellant had been "a pain in the ass" for a year and a half and that appellant was not cut out for factory work.

There is some testimony to suggest that another employee was permitted to bid out of the cast shop while under a letter of commitment not to do so. The particulars of this employee's situation, however, are unknown. Furthermore, Shammo testified that he was unsure whether this employee bid out of the cast shop or whether he received a temporary assignment to go elsewhere.

## STATEMENT OF THE LAW

■ This court notes at the outset that in reviewing a summary judgment, we must apply the same standard as does the trial court. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198, 199–200. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).

■ In his sole assignment of error, appellant argues that the trial court applied the wrong analysis in determining that Brush Wellman's proffered explanation for termination was not a mere pretext. Appellant asserts that *Kline v. Tennessee Valley Auth.* (C.A.6, 1997), 128 F.3d 337, sets forth the controlling standard to be applied concerning the issue of pretext in a discrimination case. Appellant argues that, contrary to *Kline,* the trial court required appellant to produce direct evidence of discriminatory animus.

In responding to appellant's assignment of error, we note that, in addition to addressing appellant's issue raised on appeal, Brush Wellman raises in its brief the issues of whether appellant was truly disabled or perceived to be disabled and whether appellant was qualified to perform his job. Insofar as Brush Wellman has asserted no cross-assignments of error, our review will be limited to the issue raised in appellant's sole assignment of error regarding pretext.

The Ohio Supreme court recognized in *Plumbers & Steamfitters Joint Appren-ticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 197, 20 O.O.3d 200, 203, 421 N.E.2d 128, 131–132, that *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, sets forth the formula courts should rely upon to "ferret out impermissible discrimination in the hiring, firing, promoting, and demoting of employees." The burdens of proof in employment discrimination cases were established in *McDonnell* and later clarified by *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. There are three stages of proof:

" '* * * First, the plaintiff must prove a *prima facie* case of discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093 [67 L.Ed.2d at 214–215] (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 [36 L.Ed.2d at 677–678] (1973)). If the plaintiff establishes its *prima facie* case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* (quoting *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1824 [36 L.Ed.2d at 678–679]). If the defendant carries this burden, the plaintiff must prove that the proffered reasons were pretextual. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1824 [36 L.Ed.2d at 678–679]).

Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible. *Id.* at 256, 101 S.Ct. at 1095 [67 L.Ed.2d at 217].' " *Kline,* 128 F.3d 337, 342–343.

█ In this case, the only issue before this court is whether appellant proved that the proffered reasons were pretextual. Appellant argues that the trial court incorrectly required appellant to demonstrate direct evidence of discrimination. Clearly, according to *Kline* and *Burdine,* a plaintiff can prove pretext by *either* "a *direct* showing that a discriminatory reason more likely motivated the employer or by an *indirect* showing that the employer's explanation is not credible. (Emphasis added.)" *Id.* Direct evidence of discrimination is not required, as it is often impossible to show. *Id.* at 348. See, also, *Petrilla v. Ajax Magnethermic Corp.* (1998), 82 Ohio St.3d 61, 62, 694 N.E.2d 67, 67–68, (dissent).

█ In establishing pretext, "[i]f the plaintiff shows that that employer's explanation is not credible, the trier of fact may, but does not have to, draw the inference of intentional discrimination without any further evidence of discrimination." (Citations omitted.) *Brock v. Gen. Elec. Co.* (1998), 125 Ohio App.3d 403, 408, 708 N.E.2d 777, 780. Pretext must be proven by a preponderance of the evidence. *Burdine, supra,* at 253, 101 S.Ct. at 1093–1094, 67 L.Ed.2d at 215.

In *Manzer v. Diamond Shamrock Chemicals Co.* (C.A.6, 1994), 29 F.3d 1078, the Sixth Circuit stated that in order to prove pretext, a plaintiff must show that "1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the discharge; and 3) the reasons were insufficient to warrant a discharge." *Kline* at 346, citing *Manzer* at 1084. When the first or third findings of pretext are demonstrated, a court is permitted to infer discrimination from the circumstances. *Id.* As such, "when a plaintiff proves that the defendant's proffered reasons either have no basis in fact or are insufficient to motivate discharge, a permissive inference of discrimination arises." *Kline* at 346.

## ANALYSIS

█ In this case, appellant challenges the reasons offered by Brush Wellman and argues that the following items prove that Brush Wellman's reasons for terminating appellant were a mere pretext: (1) appellant denied much of the blame for the infractions relied upon by Brush Wellman and provided rational explanations for the incidents; (2) prior to appellant's being perceived as having a mental problem, he was not confronted with any serious performance issues; (3) appellant was not permitted to transfer out of the cast department, which appellant asserts would have constituted an accommodation for his perceived

disability, while under a commitment not to do so, although "a nondisabled employee" was permitted to transfer out despite his restriction preventing him from doing so; (4) appellant's second commitment letter was not required to be written until July 17, 1996, which appellant asserts is a "considerable period of time after the June 6, 1996 incident,"[2] as compared to the first commitment letter which was written shortly after the April 30, 1996 incident; (5) two of appellant's coworkers stated in affidavits that appellant's performance compared favorably with the other employees; (6) the facts that supported appellant's prima facie case also support that Brush Wellman's reasons for firing appellant were a mere pretext for employment discrimination, such as the fact that Pevets would not allow appellant to transfer out of the cast shop and suggested that appellant consider leaving Brush Wellman because of appellant's "perceived mental deficiencies," not because appellant did not have the physical skills capable of doing the job; and (7) the commitment letters were unrealistic, as testified to by Dr. Guinan, who stated he did not think anybody could keep all the promises appellant made in the commitment letters.

Despite appellant's argument to the contrary, we note that the trial court did not require a direct showing of discriminatory animus, but rather considered whether appellant proved that Brush Wellman's proffered reasons for termination of appellant lacked credibility. If, in fact, appellant had succeeded in proving that Brush Wellman's reasons were unbelievable, an inference of discriminatory animus could have been made. In reviewing the challenges appellant made regarding Brush Wellman's reasons for termination, the trial court found that appellant's challenges were insufficient to establish that Brush Wellman's proffered reasons for termination were not credible. As such, the trial court found that no inference of disability discrimination could be made.

Accordingly, we must consider *de novo* whether appellant's challenges demonstrated that Brush Wellman's reasons had no basis in fact, did not actually motivate the discharge, or were insufficient to warrant a discharge. See *Kline*, 128 F.3d at 346, citing *Manzer*, 29 F.3d at 1084. Upon a thorough review of the record, we find that appellant failed to prove that Brush Wellman's proffered reasons for termination of appellant were a mere pretext for discrimination.

Initially, we will consider if Brush Wellman's proffered reasons for termination had any basis in fact. We find that they did. Appellant denied blame for many of the infractions and provided explanations for each; however, it is undisputed that appellant was involved with every infraction and, ultimately, had some part in causing the infractions which Brush Wellman documented. Additionally, we

---

2. Appellant does not specifically reference what occurred on June 6, 1996, and, upon thorough review of the record, this court cannot find any reference to a June 6, 1996 incident.

note that none of the infractions gone over with appellant by Hillier after the first commitment letter, but before the second, were ever explained away by appellant.

Another factor lending to the credibility of Brush Wellman's grounds for termination was the fact that appellant's infractions continued to occur even after he was transferred to another crew. If appellant's lead operator and coworkers were blaming appellant for mistakes that were not his own, then appellant's job performance should have improved after he transferred to another crew, but it did not. Many more incidents were documented by appellant's new lead operator, Shammo, after appellant's transfer following his first commitment letter.

Appellant next argues that Brush Wellman's proffered reasons lack credibility because prior to his being perceived as having a mental problem, he was not confronted with any serious performance issues. We disagree. For example, on July 8, 1994, appellant burned himself when he placed a red hot stick back into the furnace. This incident was documented by Brush Wellman and appellant was counseled for it. Additionally, the incident where appellant mistakenly placed too much of the wrong metal into the furnace occurred before it was suggested to appellant that he seek psychological counseling for his mental lapses. Furthermore, according to Pevets, before appellant would have been asked to write a commitment letter (which was contemporaneous with appellant's being asked to seek outside counseling), he would have been verbally counseled by his supervisor. Pevets and Hillier both testified to having counseled appellant on numerous occasions. As such, we find that it is inaccurate that appellant had no serious infractions prior to him allegedly being perceived as having a mental disability. Accordingly, appellant's contention in this regard does not discredit Brush Wellman's proffered reasons for terminating appellant.

Appellant additionally argues that the fact that he was not permitted to transfer out of the cast shop while he was under a commitment not to do so, when others were, demonstrates that Brush Wellman treated appellant differently from employees who were not perceived to have a disability. We disagree. Although there is some evidence to suggest that at least one other employee may have been allowed to transfer out of the cast shop while under a commitment not to do so, there is absolutely no evidence concerning this employee's work history or the nature of his infractions. Significantly, we note that there is no mention of whether this employee was permitted to bid out of the cast shop while under his *second* letter of commitment, as appellant was attempting to do. Without such information, it is impossible to compare the other employee's situation with that of appellant's, or draw any inferences therefrom.

Appellant further argues that a "considerable period of time" had passed between the "June 6, 1996" incident and appellant's second letter of commitment, as opposed to a couple of days between appellant's April 30, 1996 incident and his

first commitment letter. Initially, we note that we find no reference to a June 6, 1996 incident in the record, although there are a number of infractions occurring around that particular date. Rather, it appears from the record that there were a number of infractions between the time of appellant's first letter of commitment and his second. We find nothing of consequence in the alleged disparate timing of the first and second commitment letters.

Appellant next argues that the fact that two of appellant's coworkers considered appellant's performance to compare favorably with other employees demonstrates that Brush Wellman's proffered reasons for termination were not credible and demonstrated a discriminatory animus. We disagree. The general affidavit statements offered by appellant's coworkers, to the effect that appellant was no worse than other employees in the shop, make no mention of whether these coworkers were aware of the specific infractions with which appellant was involved. As such, they do nothing to disprove the believability of Brush Wellman's proffered reasons for termination of appellant. Moreover, a number of appellant's supervisors testified that appellant's situation was different from that of other employees in the shop because appellant's errors were not isolated incidents.

In a further attempt to prove that Brush Wellman's stated reasons for termination were a mere pretext, appellant relies on the facts that supported his prima facie case, such as the fact that Pevets would not allow appellant to transfer out of the cast shop and that Pevets told appellant he should consider leaving Brush Wellman. With respect to appellant's being prohibited from leaving the cast shop, we note that he had committed, as a condition of his continued employment, not to bid out. Appellant makes much of the fact that he was required by management to add this commitment to his letter. We note, however, that had appellant not wished to continue his employment with Brush Wellman at that time, he could have refused to make such a commitment. Appellant's commitment was merely part of the disciplinary process to which appellant was subjected because of his numerous infractions. As discussed *supra*, we find no evidence to support that "nondisabled" employees were treated differently under the same circumstances. Moreover, we find that no discriminatory animus can be inferred from Brush Wellman's enforcement of the terms of appellant's commitment letter. Additionally, Pevets's suggestion that appellant was not cut out for factory work does not prove that appellant's infractions were not a believable basis for termination or that they were insufficient to warrant a discharge. See *Kline, supra.*

Finally, appellant asserts that Brush Wellman's proffered reasons for termination were a mere pretext for discrimination because Dr. Guinan testified that he did not believe anyone could keep all the promises appellant made in the commitment letters. Even assuming as Dr. Guinan stated that no one would be

able to follow through on a commitment to make a quality product, quickly and safely, follow S.O.P.'s, and avoid mental mistakes, while continuing with outside counseling and agreeing not to bid out of the cast shop for one year, we find that this does nothing to undermine the believability of Brush Wellman's proffered reasons for termination, *i.e.*, that appellant made numerous, significant, dangerous mistakes during his time in the cast shop.

Based on the foregoing, we find that appellant failed to prove that Brush Wellman's reasons for termination had no basis in fact, did not actually motivate the discharge, or were insufficient to warrant a discharge. See *Manzer* at 1084. Accordingly, appellant failed to establish even an indirect showing that Brush Wellman's explanation for termination was not credible. See *Kline*, 128 F.3d at 342–343. Under the circumstances in this case, the trial court correctly found that appellant failed to prove that Brush Wellman's reasons for termination were merely a pretext for discrimination. Accordingly, summary judgment was properly awarded in favor of Brush Wellman. Appellant's sole assignment of error is therefore found not well taken.

On consideration whereof, the court finds substantial justice has been done the party complaining, and the judgment of the Ottawa County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.

*Judgment affirmed.*

MELVIN L. RESNICK and GLASSER, JJ., concur.

GEORGE M. GLASSER, J., retired, of the Sixth Appellate District, sitting by assignment.