**WHITE**

v.

**OHIO STATE UNIVERSITY.**

2004-Ohio-4717.]

Court of Claims of Ohio.

No. 2002–04259.

Decided Aug. 30, 2004.

14

D. Joe Griffith and Aaron R. Conrad, for plaintiff.

Larry Y. Chan, Assistant Attorney General, for defendant.

FRED J. SHOEMAKER, Judge.

{¶ 1} Plaintiff brought this action against defendant, the Ohio State University ("OSU"), alleging claims of breach of contract, promissory estoppel, age discrimination, retaliation, and violation of the Family Medical Leave Act ("FMLA"). The issues of liability and damages were bifurcated, and the case proceeded to trial on the issue of liability.

{¶ 2} Plaintiff's claims concern events that began in 1995. Plaintiff first filed her action in this court in August 2001. That case was voluntarily dismissed in October 2001. The instant action is a refiling of the prior case. On March 10, 2003, the court ruled that plaintiff's claims, including those she added in her second amended complaint, were timely filed. Upon review of that issue and the evidence submitted at trial, the court finds, for the reasons set forth in its previous decision, that plaintiff's claims are not time-barred. Accordingly, this decision will not further address the statute of limitations arguments that defendant reasserted at trial.

{¶ 3} This case involves a series of events that occurred when plaintiff was employed by OSU's Office of Minority Affairs ("OMA"). The facts that form the basis of the claim are as follows.

{¶ 4} Plaintiff began her employment with OSU on May 20, 1980. She worked with the OMA for 21 years. During that time, plaintiff was promoted from the clerical ranks to management staff. By 1995, plaintiff had achieved the position of fiscal officer, in which she was responsible for the overall supervision and management of the business office, to include all of its fiscal, personnel, and procurement operations. In 1995, OMA developed a Departmental Office Restructuring Plan, which was expected to alter various positions and job responsibilities of OMA staff members.

{¶ 5} Because of the anticipated changes at the OMA, plaintiff began to explore other employment opportunities. In August 1995, plaintiff was offered and accepted a position that involved significant responsibilities with the Equal Business Opportunity Commission Office ("EBOCO") for the city of Columbus, at a salary of approximately $50,000. However, plaintiff later rescinded her acceptance of the offer and continued working for the OMA with then Vice Provost LeRoy Pernell. Around this same time, plaintiff had discussions with Pernell and a representative from OSU's Office of Human Resources ("OHR") regarding her job title, salary, and duties. Because she had elected to remain with the OMA,

plaintiff desired a new job title, increased management and supervisory responsibilities, and appropriate salary adjustments in connection with the OMA restructuring plan. Plaintiff alleges that Pernell promised her these changes and that she relied upon those promises when she rescinded her acceptance of the EBOCO offer. Plaintiff further alleges that after several meetings the parties reached an agreement on the role that plaintiff would play under the OMA restructuring plan.

{¶ 6} The OMA restructuring plan was submitted on July 3, 1996, and was ultimately approved some time thereafter by OSU's Office of Academic Affairs. Plaintiff alleges that in performance of the agreement, the parties signed a position-description form in the early months of 1997 that confirmed plaintiff's duties and responsibilities in the restructuring process. However, in July 1997, Vice Provost Pernell resigned from his position with the OMA and OSU appointed Barbara Rich to the position on an interim basis.

{¶ 7} In May 1998, OSU, through Barbara Rich, instituted certain changes in the restructuring plan. Plaintiff alleges that the changes altered her duties under the restructuring plan by both downgrading her position in the organizational structure and eliminating all of the management, supervisory, and decision-making authority from her job description. She contends that the effect of these actions was to reduce her role to that of a clerical worker, which in turn would severely restrict her future career progression.

{¶ 8} Shortly after Rich's changes took effect, plaintiff filed an appeal through the administrative process at OSU. On May 28, 1999, OSU's provost, Ed Ray, issued a memorandum to the entire university community that stated that he was halting implementation of any further restructuring efforts at the OMA pending the appointment of a permanent vice provost. As a result, a final determination of plaintiff's appeal was not made until September 1999, when OMA's newly appointed vice provost, Dr. Timothy S. Knowles, decided the appeal.

{¶ 9} Upon review of the evidence, testimony, and arguments of counsel, the court finds for the following reasons that plaintiff has failed to prove any of her claims by a preponderance of the evidence.

{¶ 10} Plaintiff's first claim alleges that she had a contract with OSU that was part oral and part written. She contends that the contract comprised her discussions with Vice Provost Pernell, which was confirmed by the office-manager position description that she signed with him and the OHR representative.

{¶ 11} "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty." *Ford v. Tandy Transp., Inc.* (1993), 86 Ohio App.3d 364, 380, 620 N.E.2d 996, citing Restatement of the Law 2d, Contracts (1981) 5, Section 1.

The term "contract" includes every description of agreement or obligation, whether verbal or written, whereby one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act. *Terex Corp. v. Grim Welding Co.* (1989), 58 Ohio App.3d 80, 82, 568 N.E.2d 739. In order for a party to be bound to a contract, the party must consent to its terms, the contract must be certain and definite, and there must be a meeting of the minds of both parties. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134.

{¶ 12} Terms of an oral contract may be determined from "words, deeds, acts, and silence of the parties." *Ford v. Tandy Transp., Inc.,* supra. *Rutledge v. Hoffman* (1947), 81 Ohio App. 85, 36 O.O. 405, 75 N.E.2d 608, paragraph one of the syllabus.

{¶ 13} Even though a contract includes every description of agreement or obligation, whether verbal or written, there is nothing in the position description, and nothing that can be drawn from Pernell's words, deeds, acts, or silences that constituted a binding obligation in this case. To the contrary, the evidence shows that the position description at issue was subject to change as necessary and dependant upon who was in command as vice provost. Moreover, the terms of salary for the position were far from definite.

{¶ 14} Sherri Mickey–Boggs, the OHR representative who signed the position-description form,[1] testified regarding plaintiff's position and OSU's university-wide adoption of a broad-banding classification method and an Administrative Resource Management System ("ARMS"). She stated that both were extremely significant changes that were implemented prior to, and during, the OMA restructuring process. Plaintiff's position-description form contains both the agreed-upon working title of business manager and, on the same line, a handwritten notation of "OFC ADM ASC." According to Mickey–Boggs, the "OFC ADM ASC" notation designated plaintiff's broad-band classification as office administrative associate, a position that could include a wide variety of responsibilities. She testified that broad banding was a classification process that allowed OSU much greater flexibility with pay scales and job duties. She also stated that the working titles were a concept developed under broad banding that, in essence, allowed creation of job titles to more narrowly describe what an employee's particular responsibilities were. The position description does not specify a salary; it includes only a "target salary range," which, in this case, was listed as $25,000 to $42,000. At the time that plaintiff applied for the EBOCO position,

---

1. Mickey–Boggs held several managerial positions within OSU's OHR Department. At the time of trial, she had been promoted to the position of director of consulting services for that department, overseeing all employee relations matters for the university.

her salary with the OMA was approximately $37,000. Mickey–Boggs testified that broad banding did not, in and of itself, change an employee's job, salary, or benefits.

{¶ 15} Pernell testified by way of deposition regarding these matters. It is clear to the court upon reading the deposition that plaintiff and Pernell had an excellent working relationship. It is also clear that Pernell had a very relaxed management style and tended to delegate many of the OMA responsibilities to plaintiff. When the OMA restructuring plans were developed, Pernell and plaintiff worked closely together and did, in fact, draft the position description and agree upon the "working title" of "business manager." Pernell stated that while position changes recommended by a vice provost were generally approved, they were not considered official until reviewed and accepted by both OHR and the Office of Academic Affairs. Here, the position description was not signed by any representative of the Office of Academic Affairs. Nevertheless, plaintiff functioned in the role of business manager at least until Pernell's departure in 1997. Pernell acknowledged that his successor in the role of vice provost would also have authority to make recommendations and changes concerning the structure of the OMA organization.

{¶ 16} With respect to the salary issue, the evidence is clear that Pernell never agreed, much less promised, to raise plaintiff's salary to $50,000. To the contrary, Pernell testified that he "would support obtaining a salary increase if [he] could." He added, "[T]he amount of $50,000 is an amount that, I believe, came up, and I had no objection to trying to—or supporting her in getting that. But that's subject to approval, funds being available and approval by the University."

{¶ 17} When Barbara Rich was named interim vice provost, the OMA was still in a state of flux. Among other things, it was merging fiscal operations with the Young Scholars Program and Rich was involved in combining the budgets for the two entities. As a result, many of the fiscal records and documents maintained under plaintiff's control came under Rich's scrutiny. Rich testified, and the evidence corroborates, that she had a much different management style than Pernell. She characterized herself as more involved in the day-to-day functioning of the OMA and as having a much more hands-on managerial style. Further, she was involved in the implementation of the ARMS system, a process that dictated that certain office functions be separated, such as fiscal and personnel. According to Rich, the only changes to plaintiff's responsibilities that occurred were mandated by ARMS, and plaintiff herself insisted that certain of her duties be assigned to other staff members in order to comply with those mandates. Rich did appoint Ruth Wilson–Hill as her special assistant. As a result, plaintiff no longer reported directly to the vice provost. None of the changes made during

Rich's tenure resulted in a salary decrease for plaintiff; however, she did receive raises.

{¶ 18} In sum, the totality of the evidence persuades this court that there was simply no contract in this case that guaranteed plaintiff the position of business manager or a salary range close to $50,000. Rather, the evidence establishes that none of the essential elements of a contract were present under these circumstances; whatever agreement plaintiff had with Pernell did not become a binding obligation at any time and most certainly terminated when he left OSU.

{¶ 19} Plaintiff's second contract claim alleges that OSU failed to comply with its own performance evaluation and merit-based pay system, which she claims was mandatory for all departments throughout the university during her employment. Plaintiff contends that from 1992 to 1999 she received only one evaluation. She contends that she requested, and was denied, an evaluation in 1998, that the evaluation she received in May 1999 was conducted by Wilson–Hill rather than interim Vice Provost Rich, and that Wilson–Hill's evaluation was severely flawed. According to plaintiff, the lack of annual, properly conducted performance evaluations resulted in her receiving inadequate salary increases and appropriate consideration for promotions. She contends that in 1998 she received a salary increase of only six percent, whereas other OMA staff, who did have performance evaluations, received promotions and salary increases ranging from 17 to 21 percent. Further, plaintiff contends that absent the required performance evaluations, she was not eligible for merit increases.

{¶ 20} Upon review of the evidence, the court notes that plaintiff was not evaluated during the approximately five years that she served under Vice Provost Pernell. As stated previously, plaintiff and Pernell had an excellent working relationship. The court is convinced that if Pernell had evaluated plaintiff, his evaluations would have been positive. Plaintiff never complained of or filed any grievances about this issue when Pernell was in office. Rather, her claims focus upon Rich's term as interim vice provost. However, defendant's exhibits include a draft of plaintiff's performance evaluation, prepared by Wilson–Hill, for the fiscal year July 1, 1998, to May 24, 1999, wherein it is stated: "I do want to record that each staff member in the areas I supervise * * * was fully aware that all of OMA would engage in a performance management system this year and that end of year rewards would be solely merit based." This is the only reference the court finds that justifies plaintiff's insistence on the necessity of performance evaluations. Otherwise, all of the witnesses who testified regarding the matter, including Pernell and Mickey–Boggs, stated that evaluations are only one part of the realm of information relied upon in granting raises or promotions to staff members. Further, even this reference appears to address only year-end bonuses. The court finds nothing in the OSU employee-performance appraisal

manual or any of the other exhibits offered on this issue that demonstrates that evaluations were mandatory, that they had to be conducted at specified intervals, or that they had to be prepared in precise formats.

{¶ 21} The appraisal manual consists of one page of guidelines and two attachments, one of which is a sample evaluation form. The guidelines begin with a statement that "[t]he supervisor *should* complete the following steps prior to meeting with the employee: these steps are to be taken at the beginning of the appraisal period." (Emphasis added.) The sections that follow the opening statement are also prefaced with language advising what tasks the supervisor (or employee) *should* complete during the appraisal process. Moreover, one of the sections clearly states: "Remember, appraisal is an ongoing process, not an episode that occurs once a year." In short, even a cursory review of this document reveals that it simply is not written in contract terms. See *Episcopal Retirement Homes, Inc.*, supra. There is no language in this document, or any of the other evidence presented by plaintiff on this issue, that establishes a binding obligation on the part of OSU, or any of plaintiff's superiors, to perform an annual evaluation, or to perform it in a specific way.

{¶ 22} In addition to the foregoing and even assuming that evaluations had been performed at the times and in the precise manner allegedly required, the court notes that there is ample evidence to demonstrate that plaintiff's career path would not have progressed as it had when she served under Vice Provost Pernell. Specifically, the evidence shows that Rich and Wilson–Hill did not share Pernell's opinion of plaintiff's abilities. The testimony of several of plaintiff's coworkers also reflects that there were legitimate concerns with the quality of plaintiff's work. For example, Rich testified that plaintiff was often frustrated with the extent of detail required, that she objected to Rich's reviewing her work, that a $41,000 error was once found in plaintiff's fiscal records, and that plaintiff lacked knowledge in certain integral aspects of her job. There was also credible testimony that plaintiff had conflicts with several of her coworkers, one of whom asked to be moved to another building to get away from her. To her credit, many of those who testified stated that plaintiff was a very loyal and dedicated employee and that she had made significant contributions to the growth and development of the OMA. Nevertheless, the court is persuaded that it was plaintiff's inability to do the job that was expected of her by Rich and Wilson–Hill, rather than any actions, inactions, or deviations on the part of defendant, that resulted in the events that gave rise to this complaint. For these reasons, both of plaintiff's breach-of-contract claims must fail.

{¶ 23} Plaintiff has also asserted a claim based upon promissory estoppel. She contends that she turned down the lucrative position offered by the EBOCO in reliance upon Pernell's promises and, thus, that OSU should be estopped from

denying that the parties had a contract. Promissory estoppel is defined as follows: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement of the Law, Contracts 2d (1973), Section 90; *McCroskey . v. State* (1983), 8 Ohio St.3d 29, 30, 8 OBR 339, 456 N.E.2d 1204. It is axiomatic that in order for a claim of promissory estoppel to succeed, the threshold element of a promise must be met. Id. In addition, in the context of promissory estoppel, representations concerning job security must be specific promises. *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 543 N.E.2d 1212.

{¶ 24} As stated previously, the court finds that no specific promises were made with regard to plaintiff's future position or salary at OMA. An agreement to "work with" an employee or to "support" the employee's efforts does not rise to the level of an enforceable promise either at law or in equity. Likewise, the development, recommendation, and use of a working title does not amount to a specific promise to maintain an employee in that position. More significantly, the totality of the evidence fails to persuade this court that plaintiff sincerely intended to follow through with her acceptance of the EBOCO offer. There were numerous communications between plaintiff and Gwendolyn Rogers, executive director for the EBOCO, phone calls by plaintiff to Rogers's home, scheduled meetings that plaintiff failed to attend, and last-minute questions that had to be addressed, all of which culminated in Rogers's terminating the hiring process less than a week before plaintiff was scheduled to start work.

{¶ 25} In a letter dated October 13, 1995, Rogers stated: "In my opinion, the crux of the matter is that on September 25, 1995 (Monday) you called me and informed me that Ohio State University, your present employer, had made you generous counteroffer. This was the first ever mention of a counteroffer during this entire, at least month long, process and, it seems to me that the only reason a prospective employee brings up the subject of a counteroffer is one of two reasons. One, the prospective employee intends to negotiate for a higher salary with the new employer or two, the prospective employee intends to refuse the offer and remain with their current employer. Otherwise, it is really none of the prospective employer's business that a counteroffer has been made. You and I had discussed salary thoroughly and you had expressed complete satisfaction with the approximate $50,000 annual salary that had been offered * * *."

{¶ 26} Based upon the totality of the evidence, and considering the credibility of the witnesses, this court concurs with Rogers's assessment of plaintiff's actions. Moreover, the evidence is clear that all of plaintiff's positions within the OMA were classified, civil service jobs. Plaintiff was adamant about her desire to stay

in classified civil service ranks, in order to enjoy the protections afforded by that status and to remain eligible for overtime pay and compensatory hours. Generally, management positions were considered to be unclassified and overtime pay and compensatory hours were not part of the salary package.

{¶ 27} In short, the court is convinced that plaintiff did not truly want the EBOCO job but, rather, that she wanted to use it as leverage to negotiate a better position with the OMA. Therefore, even assuming that plaintiff could establish the threshold element of a promise, the court finds that she clearly did not rely to her detriment on any statements made to her in making her decisions with respect to the EBOCO offer. Accordingly, the promissory estoppel claim must fail.

{¶ 28} Plaintiff next asserts that adverse employment actions were taken against her as a result of age discrimination. The actions she complains of are the alleged demotion from her position as business manager and the effect that action had on her career progression and advancement. In her second amended complaint, plaintiff alleged only that a person younger than the age of 40 was hired to fill the position she previously occupied. At trial, she also alleged that younger persons were treated more favorably in being granted raises and promotions.

{¶ 29} R.C. 4112.02(A) states that it shall be an unlawful discriminatory practice "[f]or any employer, because of the * * * age * * * of any person, to discharge without just cause, to refuse to hire, or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 30} Pursuant to *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, a prima facie case of age discrimination may be established by indirect evidence where plaintiff demonstrates that she (1) was at least 40 years old at the time of the alleged discrimination, (2) was subjected to an adverse employment action, (3) was otherwise qualified for the position, and (4) was replaced by a person outside the protected class. If plaintiff establishes a prima facie case, the burden shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken. Id. Once a legitimate, nondiscriminatory reason is presented, the presumption of discrimination is rebutted, and plaintiff must then show that the stated reason is a pretext for discrimination. Id.

{¶ 31} However, the Tenth District Court of Appeals has held that where a case is fully tried on the merits, as was the instant action, the court is not required to explicitly discuss whether plaintiff's proof satisfied the elements of a prima facie case. *Ullmann v. Ohio Bur. of Job & Family Serv.*, Franklin App.

No. 03AP–184, 2004-Ohio-1622, 2004 WL 628231, at ¶ 15, citing *United States Postal Serv. Bd. of Governors v. Aikens* (1983), 460 U.S. 711, 713–714, 103 S.Ct. 1478, 75 L.Ed.2d 403. The court of appeals reasoned that " '[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant,' " because the court has been presented with sufficient evidence to decide the ultimate question of whether " 'the defendant intentionally discriminated against the plaintiff.' " Id., quoting *United States Postal Serv. Bd. of Governors*, 460 U.S. at 715, 103 S.Ct. 1478, 75 L.Ed.2d 403.

{¶ 32} Here, this court has previously found that plaintiff's job responsibilities were not changed as a result of any action, inaction, or deviation on the part of defendant. Rather, the court has concluded that plaintiff's job changed as a result of broad banding, ARMS, and her own inability to do the job expected of her after Pernell left the OMA. There is no question that Rich had the authority as interim vice provost to institute changes and to act upon her own opinions of her staff's capabilities. Moreover, it is clear that, to some extent, Rich was required to make changes to implement broad banding and ARMS. These same reasons are sufficient to meet defendant's burden to set forth some legitimate, nondiscriminatory reason for the actions taken. Thus, defendant has done everything that would be required of it if plaintiff had properly made out a prima facie case.

{¶ 33} Therefore, the court can turn to the question of whether plaintiff met her burden of establishing pretext. "Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible." *Detzel v. Brush Wellman, Inc.* (2001), 141 Ohio App.3d 474, 483, 751 N.E.2d 1067. The court can find no evidence in this case demonstrating that age discrimination was the motive for OSU's actions or that the explanations regarding broad banding, ARMS, and plaintiff's lack of necessary abilities should not be worthy of belief. The evidence shows that if persons younger than age 40 were promoted or received higher pay raises than plaintiff, those actions were the result of the restructuring process and the creation of new positions with significantly greater responsibilities. Moreover, Dr. Knowles, Rich, and Wilson–Hill were all over the age of 40 when they took on their roles at the OMA. It strains credulity to believe that the motivation behind their actions was a discriminatory animus against a person in their own age group.

{¶ 34} Absent a finding of illegal purpose or discriminatory intent, the general rule is that this court will not substitute its judgment for that of an employer and may not second-guess the business judgments of employers regarding personnel decisions. See, e.g., *Watson v. Kent State Univ.* (Aug. 8, 1994),

Court of Claims No. 91–06627; *Dodson v. Wright State Univ.* (1997), 91 Ohio Misc.2d 57, 697 N.E.2d 287; *Washington v. Cent. State Univ.* (1998), 92 Ohio Misc.2d 26, 699 N.E.2d 1016. Similarly, as stated by one court in the context of an Age Discrimination in Employment Act of 1967 ("ADEA") claim, "[t]he ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers." *Bienkowski v. Am. Airlines, Inc.* (C.A.5, 1988), 851 F.2d 1503, 1507–1508.

{¶ 35} Plaintiff's next claim concerns her absence from work in 1997 and 1998 when she exercised her rights under the FMLA to assist a terminally ill relative. She contends that when she returned to work, Rich had instituted the changes to her position that amounted to a demotion. The FMLA provides eligible employees up to 12 work weeks of unpaid leave in any 12–month period "for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." Sections 2601(b)(2) and 2612, Title 29, U.S.Code. At issue in this case is the protection afforded pursuant to Section 2614(a)(1) of the FMLA, whereby an employer is required to reinstate an employee to that employee's former position or an equivalent position upon return from leave. The FMLA also prohibits employers from discriminating against employees for exercising their rights under the Act. Section 2615(a)(2), Title 29, U.S.Code.

{¶ 36} However, in *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526, the Supreme Court of Ohio declined to recognize a separate cause of action in tort based upon an employer's violation of the FMLA. In so doing, the court noted: "In addition to providing substantive rights for employees and prohibitions applicable to employers, the FMLA also contains a comprehensive remedial scheme designed to compensate an employee for his or her employer's violation of the Act. Significantly, the Act entitles an aggrieved employee to compensatory damages equal to the amount of 'any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation,' plus interest calculated at the prevailing rate." Id. at ¶ 16, citing Section 2617(a)(1)(A)(i) and (ii). After extensive analysis of the compensation allowed, the court held: "When viewed as a whole, the FMLA's remedial scheme provides an employee with a meaningful opportunity to place himself or herself in the same position the employee would have been absent the employer's violation of the FMLA." Id. at ¶ 17. Accordingly, the court concluded that the employee's proper recourse was to bring the cause of action authorized by Congress in a federal court under Section 2617. Id.

{¶ 37} Nevertheless, to the extent that the *Wiles* decision is inapplicable to the facts of this case, an employee can prove FMLA retaliation circumstantially, using the method of proof established in *McDonnell Douglas Corp.*, supra.

Again, because this case was fully tried on the merits, the critical inquiry is whether plaintiff demonstrated that OSU's proffered nondiscriminatory reasons were in fact pretextual and that unlawful discrimination was the true reason for the adverse action. *Skrjanc v. Great Lakes Power Serv. Co.*, (C.A.6, 2001), 272 F.3d 309; *Reeves v. Sanderson Plumbing Prods., Inc.* (2000), 530 U.S. 133, 153–154, 120 S.Ct. 2097, 147 L.Ed.2d 105.

{¶ 38} Here, the court has previously found that plaintiff's job duties changed because of broad banding, ARMS, and plaintiff's own lack of necessary skills; however, her salary remained the same and she did receive raises. In the court's view, the job plaintiff returned to was equivalent to the one she left with the exception of mandatory changes required by ARMS and Rich's legitimate concerns for quality control. Thus, for all the same reasons set forth in the analysis of plaintiff's age-discrimination claim, the court finds that OSU has articulated legitimate nondiscriminatory reasons for the changes made to plaintiff's job responsibilities and that plaintiff failed to establish that OSU's proffered reasons were in fact pretextual. Accordingly, plaintiff's FMLA claim must fail.

{¶ 39} Finally, plaintiff has asserted a claim of retaliation in violation of public policy. She contends that OSU took the actions that in effect resulted in her demotion in retaliation for the grievance she filed based upon OSU's alleged failure to conduct performance evaluations as required. One of the essential elements to determine in connection with this type of claim is whether the employer had a legitimate business justification for its action. *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 677 N.E.2d 308. This court has made such a finding in the instant case. However, considering the totality of the evidence relative to this particular issue, the court is again convinced that none of the actions taken by defendant were motivated by anything other than legitimate business judgments, or mandates, that were made by persons with full authority to make them, based upon their rational perceptions of the OMA's best interests at the time. Accordingly, this claim must also fail.

{¶ 40} In summary, the court concludes that plaintiff has failed to demonstrate by a preponderance of the evidence that OSU breached any binding agreements or institutional policies, that it is liable to plaintiff in equity, or that its actions were motivated by age discrimination or retaliation. For all the foregoing reasons, judgment shall be rendered in favor of defendant.

Judgment accordingly.