## DODSON

### v.

### WRIGHT STATE UNIVERSITY.

Court of Claims of Ohio.

No. 93–03196.

Decided Dec. 3, 1997.

58

*Bruce E. Pence,* for plaintiff.

*Betty D. Montgomery,* Attorney General, *Stephanie D. Pestello–Sharf* and *Teri Jo Finfrock,* Assistant Attorneys General, for defendant.

DEAN STRAUSBAUGH, Judge.

Plaintiff, Melvin G. Dodson, M.D., Ph.D., filed this claim against defendant, Wright State University ("WSU"), alleging breach of contract, promissory estoppel, violation of due process, intentional infliction of emotional distress, and defamation. Defendant denied liability. On July 14, 1997, this action came before the court for trial on the sole issue of liability.

The court finds that the following facts were proven by a preponderance of the evidence. Plaintiff Melvin G. Dodson is board-certified as an obstetrician/gynecologist ("OB/GYN") and received a Ph.D. in microbiology and immunology. In 1989, plaintiff was a tenured professor and Chair of the Department of Obstetrics and Gynecology at East Tennessee State University. In the fall of 1989, plaintiff responded to a national advertisement for the position of "Nicholas J. Thompson Professor and Chair of the Department of Obstetrics and Gynecology" at the School of Medicine at WSU. Plaintiff interviewed with defendant's search committee on two occasions. Dr. Stephen M. Kaplan, then the Dean of the School of Medicine, offered plaintiff the position of professor and chair by a letter dated March 26, 1990. The letter specified the terms and conditions of plaintiff's employment. The first paragraph of the letter stated as follows:

"We are pleased to offer you the position of the Nicholas J. Thompson Professor and Chair of the Department of Obstetrics and Gynecology effective April 16, 1990. The faculty appointment has been reviewed and approved by the Faculty Development Committee of the School of Medicine. This academic appointment will be for an initial period of three years and is subject to continuance as specified by the Bylaws of the School of Medicine. The chair is an administrative appointment in which you will report to the Dean of Medicine."

The letter further provided that plaintiff's initial university salary would be at the rate of $150,000 annually.

On March 29, 1990, plaintiff accepted defendant's offer by signing and returning the letter. Plaintiff resigned his position at East Tennessee State University and began his employment with defendant on April 16, 1990. On that date, plaintiff was provided a written document titled "Fiscal Year Continuing Faculty Employment Agreement." The WSU School of Medicine does not operate on a tenure system. Tenure is a status given to a professor upon the completion of a trial period, which protects him or her from summary dismissal. West's Legal Dictionary, Special Deluxe Edition (1986), at 743. Rather, the professors are under term contracts governed by the Bylaws of the WSU School of Medicine and the faculty handbook.

Shortly after plaintiff began his employment with defendant, Dr. Kaplan was appointed as Vice President of WSU. In September 1990, Dr. Kim Goldenberg

was appointed as the Dean of WSU School of Medicine. In July 1991, Dean Goldenberg gave plaintiff a favorable evaluation for his performance as "chair." However, sometime during the summer of 1991, plaintiff began to experience problems with the perinatologists in the Division of Maternal–Fetal Medicine within the Department of Obstetrics and Gynecology. A conflict arose between plaintiff and the Division Director of Perinatology over the degree of authority between the two doctors. Plaintiff notified Dean Goldenberg that there were problems in his department and that he was having particular difficulty with one division director. Tensions escalated towards the end of 1991, and disputes arose among all three perinatologists concerning the on-call schedule and coverage of patients. By the end of 1991, the problems in the department became more serious and patient care became a concern. Plaintiff had more than one meeting with Dean Goldenberg and the associate dean to discuss the matter, albeit the substance of the discussions is in dispute.

In January 1992, Dean Goldenberg, in conjunction with the CEO of Miami Valley Hospital, organized an "*ad hoc* committee" to address the issues within the perinatal division. Specifically, the committee was to examine "1) professional conduct concerns, 2) policy for on-call coverage of high risk pregnancies, and 3) departmental management procedures especially as this [*sic*] relates to the division of maternal-fetal medicine."

The committee informally interviewed several physicians and faculty members within the Department of OB/GYN, including plaintiff and the Administrative Chief Resident, Dr. Mark LaRose. On February 20, 1992, the committee issued its report, setting forth the complaints and criticisms that were aired by the physicians. The report specifically noted that "perhaps the most important departmental management deficit noted in this saga is the failure by the Chairman to provide leadership resolving this entire issue in the department and preventing its escalation and elevation to the level of the Dean. It was felt that this matter should not have been brought to the level of the Dean without a recommendation for appropriate action by the Department Chair."

On March 13, 1992, plaintiff was called to a meeting with Dean Goldenberg and Dr. Lindower, Executive Associate Dean for Faculty Affairs, to review the *Ad Hoc* Committee Report. At the meeting, Dean Goldenberg handed plaintiff a written notice removing him as Chair of the Department of OB/GYN. During the meeting, Dean Goldenberg referred to the report and discussed the criticisms and allegations raised by the various physicians. Plaintiff requested to review the *ad hoc* report during the meeting; however, Dean Goldenberg refused on the grounds that the report was confidential. Plaintiff was offered an administrative position of assistant dean, but declined.

As a result of his removal as chair, plaintiff's salary was adjusted to $102,623, effective May 15, 1992. Plaintiff's guaranteed compensation from clinical earnings was increased to $50,000 through November 15, 1992, and was adjusted to $25,000 from November 16, 1992 through May 15, 1993. There was no further guarantee after that date.

In a memo to Dean Goldenberg dated March 17, 1992, plaintiff requested clarification about the status of his faculty contract, his salary, and the location of his office. Plaintiff also requested, in writing, the reasons for his removal as chair and again requested a copy of the *Ad Hoc* Committee Report.

Dean Goldenberg responded by a letter dated March 23, 1992, informing plaintiff that his continued faculty appointment and salary would be determined by the new chair in the usual manner. In addition, the letter stated:

"3. The reasons for your being relieved as departmental chair were discussed with you in my office on March 13. The topics included, but were not limited to:

"● Departmental management issues

"● Direct patient care concerns

"● Your impact on the residency training program

"● Your interpersonal relationships with faculty and staff

"Please understand that administrative appointments, unlike faculty appointments, are solely at the discretion of the immediate supervisor."

Plaintiff was given the administrative position of Director of the Division of Gynecology and continued as a faulty member until July 2, 1993, when he resigned.

The court will first address plaintiff's breach-of-contract claim. Plaintiff contends that his contract was for a three-year initial period in a single position as professor and chair and that, therefore, he could only be removed for good cause and with proper notice. Plaintiff's employment contract included the March 1990 letter of appointment, the Continuing Faculty Employment Agreement, the terms of defendant's Faculty Handbook, and the Bylaws of the School of Medicine. The contract, as it is expressly written, is to be interpreted as a matter of law by the court. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. Furthermore, the rule of law is that "an instrument must be considered and construed as a whole, taking it by the four corners as it were and giving effect to every part; but when one part is certain on a given subject, and all the other parts are uncertain on that subject, the certain will prevail over the uncertain." *Chan v. Miami Univ.* (1995), 73 Ohio St.3d 52, 57, 652 N.E.2d 644, 648, citing *Brown v. Fowler* (1902), 65 Ohio St. 507, 523, 63 N.E. 76, 78.

The intent of the parties to a written contract is presumed to reside in the language employed in the agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. The common words utilized in a contract will be given their plain and ordinary meaning, unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall contents of the contract. *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 597 N.E.2d 499.

The court finds that the letter that offered employment to plaintiff stated in the first paragraph that any appointment would comprise two separate positions: one was an "academic appointment * * * for an initial period of three years"; the other was an "administrative appointment," which did not specify the duration but which stated that, as chair, plaintiff would report to the dean of medicine.

Furthermore, Section D(1)(b) of the bylaws states: "Removal of a faculty member from the position of chairman in no way shall affect the individual's appointment or rank in the Faculty of Medicine." The court finds that this section makes it clear that the academic appointment and the administrative appointment are not necessarily contingent upon one another.

Plaintiff was aware that a tenure system did not exist at the WSU School of Medicine and that, therefore, any faculty appointments were "academic" and consequently were subject to a three-year initial written contract. It is the ordinary practice for universities to deem the duties of a chair to be administrative in nature and, therefore, to be treated in a different capacity than professors in the academic field.

Ohio adheres to the employment-at-will doctrine that holds that either party is free to terminate the relationship at any time for any reason which is not contrary to law. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph one of the syllabus.

The Bylaws of the WSU School of Medicine do not require defendant to give plaintiff notice of removal as chair. In fact, the bylaws are silent on the procedures for removal of a chair. There existed only a reference to the standard of "mutual good faith," but otherwise no express procedure for termination of administrative chairs. The pertinent section of the bylaws states as follows:

"D. Chairman

"Recommendation for the appointment of a Chairman or equivalent ordinarily shall be made by the Dean of Medicine upon advice of a special committee convened for this purpose. On the basis *of mutual good faith,* pointing to continuous service, the Chairman shall be appointed to a term of office determined by the Dean of Medicine in consultation with the Executive Committee.

"1. *No more than seven years shall elapse without review of the individual in the position of Chairman.* The reviewing committee shall consist of two members or representatives of each of the following: the Department of Chairman, the Dean of Medicine.

"a. The record of the individual serving as Chairman shall be evaluated in context with *the responsibilities and accomplishments of the Chairman.*

"b. Removal of a faculty member from the position of Chairman in no way shall affect the individual's appointment or rank in the Faculty of Medicine.

"2. The evaluation for continued appointment of the Chairman as a member of the Faculty of Medicine shall be initiated by the Dean of Medicine in the manner prescribed in Article II, Section B." (Emphasis added.)

Therefore, the court concludes, as a matter of law, that plaintiff's appointment as chair was an administrative appointment and, thereby, plaintiff served as chair at the pleasure of the dean or "at will." Accordingly, the court finds that defendant was free to remove plaintiff as chair without notice.

■ Even assuming there existed a contract for appointment of plaintiff for three years as chair, the contract is presumed to permit termination for good cause. See *Hosking v. Hollaender Mfg. Co.* (1961), 114 Ohio App. 70, 17 O.O.2d 339, 175 N.E.2d 201. The court finds that the findings of the *Ad Hoc* Committee establish that defendant had just cause for removing plaintiff from his position as chair.

Plaintiff contends that he was removed due to alleged problems in his "style" verses the "substance" of his work. However, teaching, research, and service are not evaluated solely on the basis of objective factors because universities traditionally have been allowed wide discretion in exercising subjective judgment in evaluating decisions such as tenure. *Lovelace v. Southeastern Massachusetts Univ.* (C.A.1, 1986), 793 F.2d 419. The court in *Kirsch v. Bowling Green State Univ.* (May 30, 1996), Franklin App. No. 95API11-1476, unreported, 1996 WL 284717, found that, absent a substantial departure from academic norms or illegal discrimination, the court would not encroach upon the professional judgment related to an evaluation of an employee's performance. Accordingly, this court finds that plaintiff's claim of breach of contract must fail.

■ In the alternative, plaintiff argues that the doctrine of promissory estoppel applies, since he had relied to his detriment on defendant's promise that he would be both professor and chair for an initial three-year term.

■ The test set forth for promissory estoppel is whether the employer should have reasonably expected its representation to be relied upon by the promisee and, if so, whether the expected action or forbearance actually resulted

in and was detrimental to the promisee. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150. This test involves four prongs. First, there must be a promise to the promisee. Second, the promisee must have relied on the promise. Third, the reliance must be justifiable. Fourth, the reliance must cause a detriment to the promisee.

The court finds that the first prong has not been met. Plaintiff has failed to prove by a preponderance of the evidence that defendant promised that he would serve as chair for a minimum of three years. Assuming *arguendo* the existence of a promise, the court finds that plaintiff's reliance was not justified. A person with the post-doctorate experience of plaintiff should have knowledge regarding the hiring practices of universities and colleges for faculty and administrative positions and should have realized that there was no guarantee that he would remain as chair for a specified period of time.

In Count III of the complaint, plaintiff contends that he was denied due process. However, constitutional claims are not actionable in the Court of Claims. *Bleicher v. Univ. of Cincinnati College of Med.* (1992), 78 Ohio App.3d 302, 604 N.E.2d 783. Accordingly, the court lacks jurisdiction over plaintiff's due process claims.

Plaintiff next claims that defendant's actions in terminating him and publishing the fact of his removal were defamatory. To establish a claim for defamation, plaintiff must prove by a preponderance of the evidence that a false publication caused injury to his reputation, or exposed him to public hatred, contempt, ridicule, shame, or disgrace, or affected him adversely in his trade or business. *Ashcroft v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 359, 365, 588 N.E.2d 280, 283–284. The court finds that plaintiff failed to prove by a preponderance of the evidence that the mere act of removing him as chair was defamatory. More specifically, plaintiff failed to prove that defendant made any communications that were untrue. Additionally, plaintiff failed to provide sufficient evidence that he had been subject to ridicule, shame, or disgrace. Therefore, the court finds that the verbal and written statements in question were not defamatory.

Even if the court had found the communications to be defamatory, they would be protected by qualified privilege. According to *McKenna v. Mansfield Leland Hotel Co.* (1936), 55 Ohio App. 163, 167, 8 O.O. 463, 465, 9 N.E.2d 166, 168–169, qualified privilege is explained as follows:

"A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or when the person is so

situated that it becomes right in the interests of society and he should tell third persons certain facts, which he in good faith proceeds to do. 17 Ruling Case Law, 341.

"The preponderance of authority supports the view that communication between an employer and an employee, or between two employees, concerning the conduct of a third employee or former employer, are qualifiedly privileged, and thus, even though such a communication contains matter defamatory to such other or former employee, he cannot recover in the absence of sufficient proof of actual malice to overcome the privilege of the occasion."

In accordance with this precedent, even where the communication is found to be defamatory, it may be protected by a qualified privilege unless there is sufficient proof of actual malice. The court finds that each communication was well within the interests of the employer. Therefore, each communication is covered under a qualified privilege, since the *Ad Hoc* Committee was under a duty to make its report. Since the communication was protected by qualified privilege, plaintiff had the burden of proof to show actual malice. The court finds that plaintiff failed to prove actual malice by a preponderance of the evidence. Therefore, even if the communications were found to be defamatory, they would be protected by qualified privilege, since plaintiff failed to prove actual malice by a preponderance of the evidence.

Along the same lines, plaintiff failed to prove that defendant intentionally inflicted emotional distress upon him. Specifically, plaintiff did not prove that defendant's conduct was extreme or outrageous or that defendant intentionally or recklessly caused him severe emotional distress. See *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666.

Based on the foregoing, the court concludes that plaintiff has failed to prove his claims of breach of contract, promissory estoppel, violation of due process, defamation, and intentional infliction of emotional distress by a preponderance of the evidence. Accordingly, judgment is rendered in favor of defendant.

*Judgment for defendant.*

DEAN STRAUSBAUGH, J., retired, of the Tenth Appellate District, sitting by assignment.