[Cite as *Murphy v. Ohio Dept. of Rehab. & Corr.*, 2011-Ohio-1848.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JUANITA MURPHY

     Plaintiff

     v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

     Defendant
     Case No. 2009-04777

Judge Clark B. Weaver Sr.
Magistrate Robert Van Schoyck

MAGISTRATE DECISION

{¶ 1} Plaintiff brought this action alleging that defendant, the Ohio Department of Rehabilitation and Correction (DRC), terminated her employment on the basis of her sex in violation of R.C. 4112.02(A).[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Plaintiff testified that she had worked for more than 13 years at DRC, and that for the last 11 years she worked as a correctional program coordinator at the Mansfield Correctional Institution (ManCI). Plaintiff's employment was terminated by the Warden of ManCI, Stuart Hudson, on March 12, 2008, following an internal investigation into telephone calls that plaintiff had made to Marilyn Christopher, who was both plaintiff's former domestic partner and a ManCI co-worker, as well as calls she made to Christopher's credit card issuer, VISA. Plaintiff does not dispute that the telephone calls were made but instead argues that she was "investigated, disciplined

---

[1]On July 8, 2010, the court granted summary judgment in favor of defendant as to plaintiff's claim for invasion of privacy.

and removed from her position as a Correctional Program Coordinator in a disparate fashion compared to males who engaged in the same, substantially similar, or more egregious conduct * * *." (Complaint, ¶15.)

**{¶ 3}** R.C. 4112.02 states: "It shall be unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment or any matter directly or indirectly related to employment."

**{¶ 4}** Disparate treatment discrimination has been described as "the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Teamsters v. United States* (1977), 431 U.S. 324, 335-336, fn. 15. In a disparate treatment case, liability depends upon whether the protected trait actually motivated the employer's decision. *Hazen Paper Co. v. Biggins* (1993), 507 U.S. 604, 610. For example, the "employer may have relied upon a formal, facially discriminatory policy that required adverse treatment" of protected employees, or the "employer may have been motivated by the protected trait on an ad hoc, informal basis." Id. "Whatever the employer's decision making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." Id.

**{¶ 5}** Plaintiff did not present any direct evidence of sex discrimination in this case. Absent direct evidence of discriminatory intent, Ohio courts resolve claims of disparate treatment sex discrimination using the evidentiary framework established by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792. See *Canady v. Rekau & Rekau, Inc.*, Franklin App. No. 09AP-32, 2009-Ohio-4974, ¶22. "Under the *McDonnell Douglas* evidentiary framework, a plaintiff bears

the initial burden of establishing a prima facie case of discrimination.  In order to do so, plaintiff must present evidence that:  (1) [she] is a member of a protected class, (2) [she] suffered an adverse employment action, (3) [she] was qualified for the position in question and (4) either [she] was replaced by someone outside the protected class or a non-protected similarly situated person was treated better."  Id. at ¶23.  (Internal citations omitted.)

{¶ 6}  Once a plaintiff establishes a prima facie case, a presumption of sex discrimination is created.  The burden of production then shifts to the defendant-employer to overcome the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for its actions.  *Allen v. Totes/Isotoner Corp.*, 123 Ohio St.3d 216, 2009-Ohio-4231, ¶4.  "If the employer articulates a nondiscriminatory reason, then the employer has successfully rebutted the presumption of discrimination that was raised by the prima facie case." *Frick v. Potash Corp. of Saskatchewan, Inc.*, Allen App. No. 1-09-59, 2010-Ohio-4292, ¶20, citing *Weiper v. W.A. Hill & Assoc.* (1995), 104 Ohio App.3d 250, 263.

{¶ 7}  As a general rule, this court will not substitute its judgment for that of the employer and will not second-guess the business judgment of employers regarding personnel decisions.  See, e.g., *Watson v. Kent State Univ.* (Aug. 8, 1994), Ct. of Cl. No. 1991-06627; *Dodson v. Wright State Univ.* (1997), 91 Ohio Misc.2d 57; *Washington v. Cent. State Univ.* (1998), 92 Ohio Misc.2d 26.  Whether a personnel decision was correct is not the issue before this court.  The court is asked to determine whether sex was a factor in the decision to terminate plaintiff's employment.

{¶ 8}  There is no question that, as a female, plaintiff is a member of a protected class.  It is also undisputed that plaintiff was qualified for her position as a correctional program coordinator and that the termination of her employment constituted an adverse employment action.  With respect to the fourth element of the *McDonnell Douglas* framework, plaintiff contends that Doug Danner, a "food service coordinator" at ManCI, was a similarly situated employee whom defendant treated more favorably.

**{¶ 9}** "It is the plaintiff's burden to establish that a similarly situated person outside the protected class was treated more favorably than [she]." *Noble v. Brinker Internatl., Inc.* (C.A.6, 2004), 391 F.3d 715, 728-729, citing *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 583. Ohio law is clear that it is not enough for a plaintiff to show that comparable non-protected persons engaged in conduct of equal seriousness and received more lenient treatment. Rather, "plaintiff must show that the 'comparables' are similarly-situated in all respects. *Stotts v. Memphis Fire Dept.* (C.A.6, 1988), 858 F.2d 289. Thus, to be deemed "similarly situated," the individuals with whom plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, supra, at 583. (Internal citations omitted.)

**{¶ 10}** Hudson, who was the Warden of ManCI from 2005 to 2008 and is now defendant's Bureau Chief of Medical Services, testified that Danner was responsible for supervising inmates in food preparation. On his way home from work on April 18, 2007, Danner stopped at a gas station and used a payphone to call the wife of a co-worker and tell her that her husband had been demoted for e-mailing pornography at work. When Masi interviewed Danner about the incident, Danner initially denied making the call, but later admitted to such conduct. (Plaintiff's Exhibit 5.)

**{¶ 11}** Hudson testified that as a result of Danner's inappropriate telephone call, his lying to Masi, his subsequent admission to Masi, and taking into account a prior episode in which Danner had been disciplined for an unrelated matter, Hudson elected to suspend Danner without pay for five days for violating Rule 12 ("Making obscene gestures or statements, or false or abusive, or inappropriate statements") and Rule 24 ("Interfering with, failing to cooperate in, or lying in an official investigation or inquiry") of defendant's Standards of Employee Conduct. (Plaintiff's Exhibit 7.) Danner's

suspension was later reduced to two days through the collective bargaining grievance process.

{¶ 12} In comparison, as a correctional program coordinator in ManCI's recovery services office, plaintiff administered drug testing and provided drug and alcohol counseling to inmates. Plaintiff worked with members of the ManCI administration, including Masi, whom she assisted during investigations that involved substance abuse. Masi testified that trust was vital to his working relationship with plaintiff because he entrusted her with confidential matters, relied upon drug testing results that she provided him during investigations, and delegated other sensitive tasks to her during investigations such as delivering cigarettes to inmates. Masi stated that he and plaintiff had a positive working relationship prior to the events at issue in this case.

{¶ 13} In explaining the background behind her misconduct, plaintiff stated that she and Christopher had been involved in a romantic relationship for approximately five years, ending in January 2007, and that they lived together during much of that time. Plaintiff stated that she had little contact with Christopher after they separated, but that recent events had caused her to become upset with Christopher. In particular, plaintiff testified that Christopher's new partner, Deb Smith, had recently been interviewed at ManCI for a position in a supervisory role, and that she believed Christopher gave Smith the interview questions beforehand. Plaintiff further stated that she had loaned money to Christopher for home repairs, with the understanding that the loan would be repaid upon the sale of the house. According to plaintiff, she learned on January 31, 2008, that Christopher had sold the house months earlier without repaying the loan.

{¶ 14} Further, plaintiff stated that she received a disguised telephone call early in the morning on February 1, 2008, before she left for work, during which she was told to decide "what was more important," her son, or the money that she had loaned to Christopher. Plaintiff stated that she believed the call came from Christopher. Plaintiff testified that when she went to work later that morning, she brought with her a calling card issued by SpoofCard, which is a commercial service that enables one to make

telephone calls using a disguised voice and a disguised telephone number; plaintiff explained that she had bought the card some time earlier to play a practical joke on a relative.   On February 1, 2008, from 10:21 a.m. to 12:51 p.m., plaintiff used the SpoofCard from her office telephone during work hours to make a series of telephone calls to Christopher.

{¶ 15} In order to make these calls, plaintiff telephoned SpoofCard, entered an identification number, selected a disguised voice, entered Christopher's telephone number and extension, and entered the telephone number that would appear on the recipient's "caller ID."  Plaintiff admitted that the calls were threatening and intimidating in nature, and she explained that she made the calls to Christopher in order to "pay her back."  According to the February 6, 2009 arbitration decision which upheld plaintiff's termination, recordings of the calls included such statements as:  "Your turn is coming"; "I will get a hold of you"; "She will rot in hell and so will you"; "I have so much anger built up over the shit that has happened to me I would love to take it out on her, I'd love to take it out on her"; "You thinking I'm fucking pissed, you've never seen me fucking pissed"; and, "Don't make me have to come down there."  (Plaintiff's Exhibit 6.)  Plaintiff admitted at trial that she made these statements, but that she believed some of them were made during another round of calls that she made to Christopher after leaving ManCI that day.

{¶ 16} In addition to making disguised calls to Christopher, plaintiff also used her office telephone to make a disguised call to VISA in which she pretended to be Christopher and reported to a customer service representative that several of Christopher's credit cards had been stolen and needed to be canceled.   Plaintiff provided the VISA representative with Christopher's Social Security number as proof of identification.   Only after the representative began to contact a bank to initiate the process of canceling the credit cards did plaintiff terminate the call.  The call lasted six minutes and 41 seconds.

**{¶ 17}** On Monday, February 4, 2008, Christopher filed an incident report accusing plaintiff of making the telephone calls. Hudson reviewed the report and assigned it to Masi for investigation. During the course of the investigation, Masi obtained documentation from SpoofCard which confirmed that the calls originated from plaintiff's office telephone.

**{¶ 18}** On February 13, 2008, Masi interviewed plaintiff as part of his investigation. According to a transcript of the interview, Masi asked plaintiff multiple times whether she made the telephone calls, and plaintiff consistently denied doing so. Plaintiff acknowledges that she lied to Masi, but she contends that she did so, in part, because she was on prescription pain medication due to breaking her leg two days earlier, she felt intimidated by the presence of an Ohio State Highway Patrolman during the interview, and because she was stressed by both a recent fire at her home and the recent deaths of her parents. However, Masi stated that he does not believe anyone else was present for the interview, that plaintiff did not apprise him of any medication she was taking, and that plaintiff's demeanor did not seem unusual.

**{¶ 19}** Later that same day, as Masi was leaving ManCI, plaintiff met him at the door and spoke with him again. Plaintiff testified that she requested another interview and offered to take a polygraph test if Christopher would also do so. Masi testified that he believed plaintiff offered to take a polygraph test to prove her innocence rather than admit any wrongdoing. Masi further testified that plaintiff never requested another interview, and that if plaintiff had ever indicated that she wished to change her story, he would have conducted another interview with her. Masi and Hudson stated that it was only during the collective bargaining "pre-disciplinary conference" on February 29, 2008, after the investigation was completed, that plaintiff finally admitted making the telephone calls. (Defendant's Exhibit B.)

**{¶ 20}** Hudson terminated plaintiff's employment on March 12, 2008, for violating Rule 18 ("Threatening, intimidating or coercing another employee or member of the general public") and Rule 24 ("Interfering with, failing to cooperate in, or lying in an

official investigation or inquiry") of the Standards of Employee Conduct. (Plaintiff's Exhibit 7.)

**{¶ 21}** Upon review of all of the testimony and the exhibits submitted, the court finds that plaintiff has not established that a similarly-situated employee who was not a member of plaintiff's protected class was treated more favorably after engaging in like misconduct. Plaintiff and Danner worked in separate departments and served much different roles at ManCI, with Danner supervising inmates in food preparation in the ManCI kitchen, and plaintiff working with ManCI administrators to monitor inmates' drug and alcohol use, providing substance abuse counseling to inmates, and assisting in confidential investigations.

**{¶ 22}** Danner's and plaintiff's misconduct was also dissimilar. Danner made one inappropriate call to the wife of a co-worker while outside the workplace and after working hours. The gist of Danner's telephone call was that the co-worker had been demoted for e-mailing pornography at work. In contrast, plaintiff used her office telephone during work hours to make numerous calls over a two and a half hour span in which she threatened a co-worker and initiated the process of canceling the co-worker's credit cards, and she took the added step of disguising both her voice and telephone number through the rather elaborate SpoofCard process.

**{¶ 23}** Although Danner and plaintiff both lied to Masi during their respective interviews, Danner ultimately admitted his wrongdoing during his interview, whereas plaintiff did not admit her wrongdoing until after the investigation had concluded, during her pre-disciplinary conference. While Danner and plaintiff were both disciplined under Rule 24 for lying to Masi, the other rules under which they were disciplined differed inasmuch as their root misconduct was dissimilar.

**{¶ 24}** Even if the court were to assume that Danner was a similarly-situated employee, defendant may avoid liability by articulating a legitimate non-discriminatory

reason for its actions. *Tex. Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253.

**{¶ 25}** Hudson testified that in coming to a decision regarding plaintiff's discipline, he considered Masi's investigation report, which included plaintiff's interview transcript and transcripts of telephone calls that plaintiff made to Christopher; the pre-disciplinary conference hearing officer's report; a "just cause worksheet"; plaintiff's lack of prior discipline; and plaintiff's years of service. Hudson testified that he had never dealt with a case similar to plaintiff's and that he considered the nature and extent of her conduct to be quite egregious.

**{¶ 26}** Hudson testified that plaintiff's disguised telephone calls evidenced substantial planning and calculation, and that they were threatening and intimidating due to both their content and the disguised manner in which they were accomplished. Hudson stated that, in comparison, Danner's lone telephone call appeared to have been made in "the heat of the moment," it was less calculated than plaintiff's, and it was nowhere near as intimidating as the calls made by plaintiff. Hudson further stated that in disciplinary matters, he generally considered conduct that occurred during work hours on the ManCI premises to demand more severe discipline than conduct that occurred outside the institution, and in this regard, Danner made one call on his own time outside the institution, while plaintiff made numerous calls from a ManCI telephone during work hours over a two and a half hour span.

**{¶ 27}** Hudson was additionally troubled that plaintiff repeatedly lied during Masi's interview, particularly in light of the fact that Masi had a close working relationship with plaintiff and Masi needed to be able to trust her when she assisted him with investigations. Indeed, Masi testified that he and plaintiff had worked together during investigations for several years, and that trust was essential to their working relationship because the information obtained through drug and alcohol testing, which plaintiff administered, needed to be confidential and reliable. Masi stated that he was troubled by plaintiff lying to him in the interview and that the episode lessened her

credibility. In contrast, Danner and Masi never worked together and there is no evidence that Danner's job duties involved confidential or sensitive matters.

**{¶ 28}** Upon review, the court finds that defendant articulated legitimate nondiscriminatory reasons for terminating plaintiff's employment.

**{¶ 29}** Having so found, the court must next determine whether plaintiff demonstrated by a preponderance of the evidence that the reasons offered by defendant were not its true reasons, but were a pretext for discrimination. *McDonnell Douglas*, supra, at 804. In order to meet this burden, plaintiff must prove: "'(1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the discharge, or (3) that the proffered reason was insufficient to motivate the discharge.'" *Owens v. Boulevard Motel Corp.* (Nov. 5, 1998), Franklin App. No.97APE12-1728, quoting *Frantz Beechmont Pet Hosp.* (1996), 117 Ohio App.3d 351, 359.

**{¶ 30}** Plaintiff asserts that her misconduct was not sufficient to justify her termination, and she further asserts that differences in the way that Masi interviewed her and Danner demonstrate that defendant's proffered reasons for discharging her are pretext. In particular, plaintiff contends that Masi stopped and then restarted the tape recorder during Danner's interview, but he refused to grant her a second interview. Plaintiff also argues that Masi induced Danner to admit his wrongdoing by disclosing that he had obtained incriminating evidence, but that Masi did not disclose any such evidence during her interview.

**{¶ 31}** In determining how to discipline plaintiff and Danner, Hudson considered several factors, including the transcripts of their interviews with Masi. To the extent that the alleged differences in the way that plaintiff and Danner were interviewed are evident in the transcripts, Hudson was able to consider such circumstances and assess them accordingly. Further, upon weighing plaintiff's testimony that she requested a second

interview against Masi's testimony that plaintiff never made such a request, the court finds Masi's testimony to be more credible.

**{¶ 32}** After reviewing the transcripts and other factors germane to each case, the court finds that Hudson exercised his business judgment and made personnel decisions as he saw fit. Hudson testified as to how he reached his decisions, and the court finds that his reasoning was genuine, credible, and supported by the evidence presented at trial. Moreover, the court finds that Hudson's reasons for terminating plaintiff's employment were sufficient.

**{¶ 33}** For the foregoing reasons, the court finds that plaintiff has failed to prove her claim of discrimination by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate

cc:

Daniel H. Klos
4591 Indianola Avenue
Columbus, Ohio 43214

Eric A. Walker
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

GWP/RCV/cmd
Filed March 22, 2011
To S.C. reporter April 12, 2011